Elmer W. AHMANN, Jr., Administrator of the Estate of James H. Ritner, Deceased, Appellant,

v.

UNITED AIR LINES, INC., a Corporation, Appellee.

Jane F. GANDY, Executrix of the Estate of Jack S. Gandy, Deceased, Appellant,

v.

UNITED AIR LINES, INC., a Corporation, Appellee.

Nos. 17065, 17066.

United States Court of Appeals Eighth Circuit.

Feb. 6, 1963.

J. D. James, Kansas City, Mo., Alvin C. Randall, of Hogsett, Houts, James, Randall & Hogsett, Kansas City, Mo., and Gibson Langsdale and Clif Langsdale and S. L. Trusty, Kansas City, Mo., on the brief, for appellants.

Morris H. Kross, Kansas City, Mo., Clay C. Rogers, of Rogers, Field & Gentry, Kansas City, Mo., on the brief, for appellee.

Before VOGEL and VAN OOSTERHOUT, Circuit Judges, and VAN PELT, District Judge.

VOGEL, Circuit Judge.

On June 30, 1956, two passenger airplanes carrying a total of 128 persons left Los Angeles airport, one being a Trans World Airlines Constellation bound non-stop for Kansas City, Missouri, and the other a United Air Lines DC–7 bound non-stop for Chicago, Illinois. Approximately an hour and a half later the two planes collided in mid-air and crashed into the bottom of the Grand Canyon, killing all occupants. There were no witnesses to describe the tragedy. These lawsuits are concerned with liability for the collision.

The plaintiffs-appellants are the personal representatives respectively of the co-pilot and pilot of the TWA Constellation. They brought these actions against United Air Lines, Inc., defendant-appellee, for damages for the wrongful deaths of their decedents based upon the Wrongful Death Act of the State of Arizona and the negligence law of that state.

Plaintiffs' complaints charge that the defendant-appellee, United Air Lines, Inc., negligently failed to keep a proper lookout, negligently failed to give way when overtaking the rear of the TWA Constellation occupied by plaintiffs' decedents, and negligently collided with the rear of the TWA plane when the defendant saw or should have seen said plane in time to avoid striking it. Upon joinder of issue, the cases were consolidated and tried. The jury returned two verdicts, one in favor of the plaintiff Ahmann in the amount of $45,000 and the other in favor of the plaintiff Gandy in the amount of $64,000. Defendant made motions for judgments notwithstanding the verdicts. The District Court granted defendant's motions, decreeing that the plaintiffs take nothing and that their complaints be dismissed with prejudice and costs. Appeals from the final judgments were made to this court.

The principal, if not the only, issue on appeal is whether the trial court erred in granting the motions for judgments notwithstanding the verdicts. In other words, this court is required to determine whether the evidence was sufficient to permit the jury to resolve the issue of negligence. In making that determination, we, of course, must take that view of the evidence most favorable

to the plaintiffs and must accept as established all inferences that reasonably can be drawn therefrom and which support the jury's verdicts.

An examination of the evidence so viewed indicates the following:

At 9:01 a. m. on June 30, 1956, TWA Flight No. 2, a Constellation 1049, took off from Los Angeles on its non-stop flight to Kansas City, Missouri. The flight plan filed by the TWA pilots with Air Route Traffic Control at Los Angeles called for a flight from Los Angeles via established airways to Daggett, California, thence direct to Trinidad, Colorado, and on via direct flight to Kansas City. Reporting points for the flight were to be at Daggett, California, Lake Mojave, Nevada, the 321° Radial of Winslow, Arizona, Farmington, New Mexico, Trinidad, Colorado, and other points further east. Their flight plan also called for and was cleared by ARTC at an altitude of 19,000 feet.

At 9:05 a. m. United Air Lines Flight No. 718, a DC–7, took off from Los Angeles bound on its non-stop flight for Chicago, Illinois. The flight plan of United Air Lines called for flight from Los Angeles via Green Airway 5 to Palm Springs Intersection, direct to Needles, California, direct to PDQ, direct to Durango, Colorado, and on to points further east to Chicago. The flight plan called for and was cleared by ARTC for flight at an altitude of 21,000 feet.

At 9:30 a. m. the TWA flight was approaching Daggett, California. Through its radio station at Los Angeles it contacted ARTC, requesting clearance for an amendment to its flight plan from an altitude of 19,000 feet to 21,000 feet. Permission was refused because of United Air Lines Flight 718 having been given an altitude of 21,000 feet. Permission was granted, however, for TWA Flight 2 to "maintain at least 1,000 feet on top". This meant that if Visual Flight Rules conditions (VFR) existed and could be maintained, the TWA Constellation was free to occupy any odd-numbered altitude while traveling in a generally easterly direction. Had TWA been granted the requested 21,000 feet altitude, that would have allowed it to travel through clouds at that altitude and it would not have been necessary to maintain VFR conditions.

The collision of the two planes, however, occurred in what is known as uncontrolled air space; that is, an area outside of any controlled zone or controlled airway. In such uncontrolled air space, the only means of avoiding collision is to maintain Visual Flight Rules conditions; that is, the "see and be seen principle". Section 60.30(b) (1), Civil Air Regulations, provided that planes outside of control zones "shall not be flown less than 500 feet vertically under, 1,000 feet vertically over, and 2,000 feet horizontally from any cloud formation"; and Section 60.31(d) thereof provided that, "When outside of control zones and control areas, no person shall operate an aircraft in flight when the flight visibility is less than one mile." Flying in "VFR" conditions means flying in air space where the foregoing minimums can be maintained. Being in uncontrolled air space, both planes were required to stay where they could fly VFR.

At approximately 10:31 a. m. a message was received on United Air Lines radio at Salt Lake City understood to be as follows: "Salt Lake, United 718— (pause) we're going in." No other report was received from either plane indicating difficulty.

The facts known about the two flights indicate that the defendant's DC–7 was making faster time than the TWA plane by some 30 to 35 miles per hour. The flight plan of the United DC–7 called for a speed that was over 20 miles per hour faster than that proposed by the TWA pilots. In their last report over Lake Mojave at 9:55 a. m., the TWA pilots estimated crossing the Painted Desert line of position at 10:31 a. m. (The Painted Desert line of position is not a definite fixed point but is a line about 175 to 200 miles long stretching from Bryce Canyon, Utah, to Winslow, Arizona.) Such an arrival time would call for an average speed of 326 miles per hour. At

9:58 a. m. the United pilots reported over Needles and also estimated crossing the Painted Desert line of position at 10:31 a. m. This would require an average speed of 358 miles per hour, or a difference in estimated speeds of 32 miles per hour. The actual average speed to the point of collision was 296 miles per hour for the TWA and 330 miles per hour for United, or a difference of 34 miles per hour. Finally, the United plane took off later and had a greater distance to fly to reach the point of impact, which was approximately one mile from the confluence of the Colorado and Little Colorado Rivers but short of the Painted Desert line of position. Concededly, both planes were off course at the time of collision. Had each plane maintained its course, their flights would not have crossed until some distance beyond the Painted Desert line of position.

The foregoing determinations were made through an investigation conducted by experts from the Civil Aeronautics Board. In addition, they formed a Structures Committee to study the debris from the two planes as it was found in the canyon. Parts of the wreckage were removed and taken to Washington, D. C., where they were tested by the Bureau of Standards, photographed and studied further by members of the Structures Committee. It was established without substantial dispute which portions of the planes came together in the initial impact and the attitudes of the two planes in relation to each other but not with relation to the ground. There was no way of ascertaining the altitude at the time of collision.

The largely uncontroverted physical facts were these: The fuselage of the TWA wreckage was found mostly in the same general area. With the wreckage of the TWA fuselage was found about 20 feet of the left wing of the United DC–7. This partial wing was not found intact but, rather, in several parts. The pieces were severely damaged and showed evidence of having been in contact with some other object. The leading edge of the wing was bashed in from front to back. Pieces of skin from the underside of the wing were scratched in an inward and aft direction and at an angle of 20° to 25°. The scratches came from the rivets in the rear fuselage of the TWA Constellation. The left wing tip was bent and wrinkled in an inward and upward direction. There were black rubber smudges and smudges of red paint on that deformity. It was established that the smudges came from the TWA silver surface stripping, the leading edge of the left fin of the Constellation and the de-icer boot of that left fin. Embedded in the lower wing skin of the United was a piece of headliner from the TWA Constellation. Headliner is a fabric material found in the interior upholstery of the latter plane. Also this piece had brown smudges on it which were identified as sealant from the TWA rear pressure bulkhead.

The parts of the left wing of the United plane found with the TWA main wreckage were approximately a mile and a half from the wreckage of the rest of the DC–7 plane, which was to the north-northeast of the Constellation wreck. Because of the nature of the respective damage to each plane, the United plane would have the greater degree of control after the collision. Christiansen, defendant's expert, testified that based upon the distribution of the wreckage and his knowledge and experience, "There was no question in my mind that both of these aircraft were headed in a general north-easterly direction" at approximately the time of collision.

A piece of the TWA fuselage skin about one and a half to two feet wide and about three to four feet long was found. It came from the upper right-hand section of the fuselage just ahead of the tail. It was folded across diagonally. There were several scratches and smudges of blue and white paint on this piece. The piece itself was originally painted white. The blue paint was identified as the blue paint from the wing tip of the DC–7.

The tail section of the Constellation was found about one-third of a mile from

the main TWA wreckage. The right and left fins were broken off and found near the rest of the tail assembly. The left vertical fin of the Constellation had received a blow from the right side that bent it in and pushed it through to the left side. It was found that the damaged left fin of the TWA and the damaged left wing of the United plane fit together much like a "jigsaw puzzle". There was some inflight damage to the TWA's center fin right at the junction with the fuselage. There was no mid-air damage to the rear end of the Constellation's tail. There was testimony that the leading edge of the left tail fin of the Constellation was separated in the air.

There were also propellor cuts in the rear belly of the TWA aircraft. There were three such cuts going from right to left with the longest of the three in the center. They ran parallel to each other and were made by a clockwise rotation of the DC-7 propellor tips. Smudges of blue and red paint were found around these cuts which apparently came from the United propellors.

Certain heavy objects were found some distance to the west-southwest of the main TWA wreckage, such as a water container and the rear pressure bulkhead door of the TWA plane. The latter was bent forward at an angle of 180°. Defendant's expert witness Christiansen and plaintiffs' expert witness Brick testified that such heavy objects would drop more rapidly, thereby accounting for their being found furtherest back on the flight track.

From the physical evidence thus described, it was deduced that the outer part of the DC-7 left wing came in contact with the upper right-hand portion of the TWA fuselage just head of the tail assembly. The tip of the DC-7 left wing contacted the leading edge of the TWA center fin and then immediately and with greater force contacted the leading edge of the TWA left fin, knocking it off in flight. The DC-7 left wing then cut or went through the fuselage and into the rear part of the pressurized cabin of the TWA, causing the rear pressure bulkhead door to be deformed and causing the empennage to separate from the TWA fuselage and causing material to burst out of the pressurized cabin when the pressure was released. At the time of this movement, the left outboard propellor of the DC-7 cut the three consecutive slashes moving from right to left along the belly of the TWA fuselage.

Although there was disagreement among the witnesses, expert opinion evidence demonstrated from the location and physical condition of the debris that the DC-7 was going faster at the time of impact. Plaintiffs' expert Brick testified that on the basis of the condition of the debris that during the flight there was a converging movement, a movement "with the DC-7 going from right to left and the Constellation going from left to right. * * * a closing in and a moving forward with respect to one another." He also testified that the markings on the underside of the DC-7 left wing "ran predominantly inward and aft, which indicated the DC-7 was going faster", and the scratches plus the fact the leading edge of the DC-7 left wing and its front spar section showed impact from the forward side to the rear side indicating that the DC-7 was moving forward with reference to the TWA at time of impact.

Upon the question of the attitudes of the planes at the time of impact, it was agreed that the aircraft were thus: The longitudinal axes on a horizontal plane were at an angle of 25° to 30° with the noses of the planes closer and the tails farther apart. The right wing of the DC-7 was down 20° with reference to the Constellation, or the Constellation right wing was up 20° with relation to the United craft. The nose of the DC-7 was down 5° to 10° with reference to the longitudinal axis of the TWA craft, or the nose of the Constellation was up relative to the United plane. Nothing could be told about the relative positions with respect to the ground.

As to the angle of approach and the visibility of the other plane, it was said that if the United plane approached the TWA it would have been at an angle of

12° to 14° while both planes were flying in a general northeast or east by northeast direction. Any evasive action that was taken could not have appreciably altered the general heading, nor would any deviation, if taken because of cloud build-ups, have done so. The lateral visibility from the DC–7 cockpit was 112°. The TWA pilots would not have been able to see the DC–7 if it were on a collision course angle of less than 20°. By overtaking at any angle, the United pilot would have more to look at than if he were directly astern. There was also evidence that under clear flying conditions and at the relative rate of speed the planes may have been flying, that the TWA, which was about 130 feet long and about 120 feet wide, would have been visible to the United pilots for five minutes and that the pilots' reaction time would have been 11 to 16 seconds.

The trial and appeals here have occasioned no dispute with reference to the legal obligations of the operators of the two planes and the fact that such obligations spring from the Civil Air Regulations promulgated by the CAB and from the general law of negligence of the State of Arizona where the accident occurred. Arizona Revised Statutes Annotated, Vol. 2, § 2–208, provides as to liability in the operation of aircraft:

"*Aircraft collisions; law governing liabilities*

"The liability of the owner of one aircraft to the owner of another aircraft or to aeronauts or passengers on either aircraft, for damage caused by collision on land or in the air shall be determined by the law applicable to torts on land."

Under the law of Arizona, operators of vehicles must keep and maintain at all times a lookout for other vehicles. Layne v. Hartung, Ariz., 1960, 348 P.2d 291, 293–294.

The applicable portions of the Civil Air Regulations which were in effect on June 30, 1956, are as follows:

"60.12 *Careless or reckless operation.* No person shall operate an aircraft in a careless or reckless manner so as to endanger the life or property of others.

\*　\*　\*　\*　\*　\*

"(c) Lack of vigilance by the pilot to observe and avoid other air traffic. In this respect, the pilot must clear his position prior to starting any maneuver, either on the ground or in flight."

"60.14 *Right-of-way.* An aircraft which is obliged by the following rules to keep out of the way of another shall avoid passing over or under the other, or crossing ahead of it, unless passing well clear:

"Note: Right-of-way rules do not apply when, for reasons beyond the pilot's control, aircraft cannot be seen due to restrictions of visibility. The aircraft which has the right-of-way will normally maintain its course and speed, but nothing in this part relieves the pilot from the responsibility for taking such action as will best aid to avert collision.

\*　\*　\*　\*　\*　\*

"(b) *Converging.* Aircraft converging shall give way to other aircraft of a different category in the following order: airplanes and rotorcraft shall give way to airships, gliders, and balloons; airships shall give way to gliders and balloons; gliders shall give way to balloons. When two or more aircraft of the same category are converging at approximately the same altitude, each aircraft shall give way to the other which is on its right. In any event, mechanically driven aircraft shall give way to aircraft which are seen to be towing other aircraft;

\*　\*　\*　\*　\*　\*

"(d) *Overtaking.* An aircraft that is being overtaken has the right-of-way, and the overtaking aircraft, whether climbing, descending, or in horizontal flight, shall keep out of the way of the other aircraft by altering its course to the right, and no subsequent change in the relative po-

sitions of the two aircraft shall absolve the overtaking aircraft from this obligation until it is entirely past and clear;

"Note: Passing an overtaken aircraft on the right is required because the pilot in side-by-side, dual-control aircraft is seated on the left and has a better view on that side. Further, in narrow traffic lanes, passing on the left of an overtaken aircraft would place the overtaking aircraft in the path of the oncoming traffic."

"60.15 *Proximity of aircraft*. No person shall operate an aircraft in such proximity to other aircraft as to create a collision hazard. * * "

■ The trial judge accurately instructed the jury as follows:

"Therefore, you are instructed that if you find and believe from the evidence that at and prior to the collision the defendant's DC–7 was traveling at a greater speed than the TWA Constellation, and if you find that the DC–7 approached the Constellation from the rear, so that the TWA plane was within the range of visibility of the crew of the United Air Lines plane, so that the pilot or co-pilot of defendant's plane saw or should, in the exercise of reasonable care, have seen the Constellation in time to have altered the course of the DC–7 to the right and passed clear of the Constellation, and if you find that the defendant, through its agents and employees, under the circumstances just stated, failed to alter the course of its plane to the right and pass clear of the Constellation; and if you further find that defendant was thereby negligent, and that such negligence directly caused the collision in question and the death of plaintiffs' decedent; and if you further find that plaintiffs' decedents were at all times exercising ordinary care for their own safety, then you are instructed that your verdict will be in favor of plaintiff and against the defendant in each case."

He also charged:

"It was the duty of the Pilot and Co-Pilot on each plane to use ordinary care in keeping a reasonably careful and vigilant lookout to see and avoid collision with aircraft.

* * * * * *

"In regard to plaintiffs' theories of claim against United, you are instructed that you may presume that at all times here material both planes were flying in Visual Flight Rules conditions and were flying at least 2,000 feet horizontally from clouds, if any, at least 500 feet below clouds, if any, and at least 1,000 feet above clouds, if any. You are further instructed that under such circumstances and conditions a pilot is required by law to exercise reasonable care to observe and avoid collision with other aircraft, and this is true, regardless of traffic clearances previously secured from ARTC."

Neither plaintiffs nor defendant assign any error as to the above instructions and we think it may not be gainsaid that the trial court properly instructed on the issue of negligence.

■ It may well be true, and undoubtedly in this case is true, that honest able men disagreed in their interpretation of the physical facts found after the collision. Experts with years of experience and obviously dedicated to their tasks made different interpretations. To one, the indications were clear that "the DC–7 was going faster" and "the DC–7 was moving forward with reference to the Constellation" at the time of the collision. Other expert testimony had it that the planes came together in a converging motion with the TWA moving from its left to its right and the DC–7 moving from its right to its left. These are the inferences which the jurors were entitled to draw from the uncontradicted testimony with reference to physical findings and the conflicting opinions of the experts based thereon. Certainly we cannot say that fair-minded men could not draw different inferences and come to different conclusions from the testimony

in this case and therefore we think a jury issue was indicated. Unless we can say that reasonable persons could not disagree, then the jury verdict must stand. The physical evidence here points, we think, most strongly to the conclusion that United was the overtaking plane. The flight plans of the respective pilots, the positions from which they made their last reports, the conceded manner in which the two planes first collided, the distribution of the debris of the two planes on the floor of the canyon, the fitting together like a jigsaw puzzle of part of the left wing of the DC–7 with rear portions of the TWA—these are all facts, not inferences, and we think from them and from the testimony of the experts that the jury could, as it evidently did, reasonably conclude that the DC–7 was the overtaking plane, that it was traveling faster than the TWA, and that its pilot's failure to yield the right-of-way to the overtaken plane resulted from his failure to keep a proper lookout.

No question has been raised here by the parties as to what standard for the "sufficiency of the evidence" is applicable. The accident occurred in Arizona. The cases were tried in Missouri but in the federal courts of that state. Whether the Arizona rule should be applied, or that of the State of Missouri where the case was tried and which would be in accord with Rowe v. Pennsylvania Greyhound Lines, 2 Cir., 1956, 231 F.2d 922, certiorari denied 351 U.S. 984, 76 S.Ct. 1052, 100 L.Ed. 1498, or that of the federal courts is, however, immaterial here since we think there exists no substantial difference between the three jurisdictions. See Wray M. Scott Co. v. Daigle, 8 Cir., 1962, 309 F.2d 105.

In Tennant v. Peoria & P. U. Ry. Co., 1944, 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520, rehearing denied 321 U.S. 802, 64 S.Ct. 610, 88 L.Ed. 1089, the Supreme Court reversed a Court of Appeals' holding that a motion for judgment notwithstanding the verdict should have been granted. In concluding that a jury issue was clearly indicated, the Supreme Court said at page 35 of 321 U.S., page 412 of 64 S.Ct.:

"It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences. The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. Washington & Georgetown R. Co. v. McDade, 135 U.S. 554, 571, 572 [10 S.Ct. 44, 34 L.Ed. 235]; Tiller v. Atlantic Coast Line R. Co., supra [318 U.S. 54], 68 [63 S.Ct. 444, 87 L.Ed. 610]; Bailey v. Central Vermont Ry., 319 U.S. 350, 353, 354 [63 S.Ct. 1062, 87 L.Ed. 1444]. That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable."

Tennant was cited as being controlling in the case of Sentilles v. Inter-Caribbean Corp., 1959, 361 U.S. 107, 110, 80 S.Ct. 173, 4 L.Ed.2d 142. In that case the jury was called upon to draw an even greater inference than herein, since there no medical expert was willing to state absolutely that the trauma suffered by the plaintiff was the cause of his tubercular condition.

In Lavender v. Kurn, 1946, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916, the Supreme Court again protected the right to

a jury trial by saying, at page 653 of 327 U.S., page 744 of 66 S.Ct.:

"It is no answer to say that the jury's verdict involved speculation and conjecture. Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, *a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference.* Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. But where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable." (Emphasis supplied.)

In a diversity case involving Missouri law this court, speaking through Judge John Sanborn, said in Anglen v. Braniff Airways, Inc., 8 Cir. 1956, 237 F.2d 736, 740:

"* * * In a jury case, where conflicting inferences reasonably can be drawn from evidence, it is the function of the jury to determine what inference shall be drawn. Compare, Lavender v. Kurn, 327 U. S. 645, 652–653, 66 S.Ct. 740, 90 L. Ed. 916, and Chicago & N. W. R. Co. v. Grauel, 8 Cir., 160 F.2d 820, 825–826. It is only where the evidence is all one way, or so overwhelmingly one way as to leave no doubt what the fact is, that a court is justified in taking a case from a jury. See Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 74 L.Ed. 720; and compare, Hoyt v. Clancey, 8 Cir., 180 F.2d 152, 154–155."

In that case the trial court had taken the issue from the jury and directed a verdict at the close of plaintiff's case.

This court reversed and remanded for a new trial. See also Continental Can Co. v. Horton, 8 Cir., 1956, 250 F.2d 637, 643; National Molasses Company v. Herring, 8 Cir., 1955, 221 F.2d 256, 259; Weiss v. Commissioner of Internal Revenue, 8 Cir., 1955, 221 F.2d 152, 155–156.

The Supreme Court of Missouri, in Tharp v. Monsees, Mo., 1959, 327 S.W.2d 889, said, at page 894:

" 'Negligence is ordinarily a question for the jury. It is always so when the evidence on material points is conflicting, or where, the facts being undisputed, different minds might reasonably draw different conclusions from them.' Gratiot v. Missouri Pac. Ry. Co., 116 Mo. 450, 466, 21 S.W. 1094, 1098. *A case may not be withdrawn from the jury unless all reasonable men in the honest exercise of a fair, impartial judgment, would draw the same conclusion from the facts which condition the issue.* Parrent v. Mobile & O. R. Co., 334 Mo. 1202, 70 S.W.2d 1068, 1073; Lloyd v. Alton R. Co., 348 Mo. 1222, 159 S.W.2d 267, 272; Fortner v. St. Louis Public Service Co., Mo.Sup., 244 S.W.2d 10, 13.

"In ruling the issue presented we must give plaintiff the benefit of his evidence and every inference of fact in his favor, which a jury might, with any degree of propriety, have inferred, since a verdict may be directed against a plaintiff only when the facts and inferences to be drawn therefrom, considered in the light of the rule, are so strongly against the plaintiff as to leave no room for reasonable minds to differ. Sibert v. Boger, Mo.Sup., 260 S.W.2d 569, 571; De Lay v. Ward, 364 Mo. 431, 262 S.W.2d 628, 633; Hillhouse v. Thompson, 362 Mo. 700, 243 S.W.2d 531, 536." (Emphasis supplied.)

The Supreme Court of Arizona stated the law for that state in Figueroa v. Majors, Ariz., 1959, 338 P.2d 803, 804, as follows:

"It is well settled in this jurisdiction that a motion for a directed ver-

dict for the defendant admits the truth of whatever competent evidence the opposing party has introduced, including all inferences that reasonably can be drawn therefrom, and requires that the evidence be interpreted most strongly against the moving party and in the light most favorable to the opposing party. Matsumato v. Arizona Sand & Rock Company, 80 Ariz. 232, 295 P. 2d 850, 56 A.L.R.2d 1385; Savage v. Boies, 77 Ariz. 355, 272 P.2d 349; Gallaway v. Smith, 70 Ariz. 364, 220 P.2d 857; Nichols v. City of Phoenix, 68 Ariz. 124, 202 P.2d 201. *It is further fundamental that a verdict will not be directed where the evidence on material facts is conflicting, or where on undisputed facts reasonable and fair-minded men may differ as to the inferences and conclusions to be drawn, or where different conclusions might reasonably be reached by different minds, and thus the question of negligence and proximate cause is one of fact to be submitted to the jury and not a question of law for the court;* if, upon all the facts and circumstances, there is a reasonable chance or likelihood of the conclusions of reasonable men differing, then the question is one for the jury. Cope v. Southern Pacific Co., 66 Ariz. 197, 185 P.2d 772; Durham v. Firestone Tire & Rubber Co. of California, 47 Ariz. 280, 55 P.2d 648; Matsumato v. Arizona Sand & Rock Company, supra." (Emphasis supplied.)

See also Gamewell Company v. City of Phoenix, 9 Cir., 1954, 216 F.2d 928, 940; opinion amended 219 F.2d 180, which was a diversity case dealing with the law of Arizona, wherein the Court of Appeals for the 9th Circuit stated, at page 940 of 216 F.2d:

"The trial court was free to choose between these alternative versions and to 'weigh more heavily for' the appellee. United States v. Yellow Cab Co., 1949, 338 U.S. 338, 342, 70 S.Ct. 177, 94 L.Ed. 150."

Defendant relies heavily upon the case of New York Life Insurance Company v. McNeely, 1938, 52 Ariz. 181, 79 P.2d 948, in which the rule was established in Arizona that an "inference upon an inference" would not be permitted unless all prior inferences substantiating the ultimate inference are established beyond a reasonable doubt. We fail to see the applicability of either the case or the rule to the situation at hand for here we find no "inference upon an inference". The jury's conclusions that the United plane was traveling faster, was overtaking the TWA craft and was negligent in failing to maintain a proper lookout are parallel inferences deduced from uncontroverted evidence. See Rowe v. Pennsylvania Greyhound Lines, supra. For an analysis of the "inference on inference" rule and Missouri's view thereof, see the opinion of its Supreme Court in Winters v. Terminal R. Ass'n of St. Louis, 1952, 363 Mo. 606, 252 S.W.2d 380, 384–385.

The defendant here would have us defer to the opinion of the trial court, citing certain cases from the Supreme Court of Missouri and also numerous cases from this court, such as Village of Brooten v. Cudahy Packing Co., 8 Cir., 1961, 291 F.2d 284, where Judge Blackmun so accurately states the rule of this Circuit regarding the standard for review on doubtful questions of state law. We have no doubtful questions of state law involved herein. The parties do not disagree on the principles of law governing this case. Counsel for the defendant state, at page 22 of their brief:

"* * * there is no question or issue, in this case, as to the applicable law of negligence or the component elements necessary to arrive at a permissible conclusion of liability."

We believe that the standard for the "sufficiency of the evidence" to make an issue for the jury is clearly indicated in the federal, Missouri and Arizona cases

cited and that if reasonable men may differ, then the issue is for the jury. As was said in Tennant, supra, "The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury." Here we find a reasonable basis in the evidence for the jury's conclusions. By granting the defendant's motions for judgment notwithstanding the verdicts, the plaintiffs here were deprived of a jury trial.

These cases are reversed and remanded with directions to reinstate the judgments based on the jury verdicts.