[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-15662

_____

D.C. Docket No. 2:12-cv-00895-WKW-TFM

CYNTHIA SEAMON,
individually and as Personal Representative of the
Estate of Kenneth Seamon, deceased,

Plaintiff-Appellant,

versus

REMINGTON ARMS COMPANY, LLC,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

(February 17, 2016)

Before JORDAN and JULIE CARNES, Circuit Judges, and ROBRENO,[*] District
Judge.

ROBRENO, District Judge:

_____

[*] The Honorable Eduardo C. Robreno, United States District Judge for the Eastern
District of Pennsylvania, sitting by designation.

This appeal arises out of a product liability case against Remington Arms Company, a gun manufacturer. The district court excluded Plaintiff's expert – who concluded that Plaintiff's husband died as a result of a defect in the design of his rifle – finding his opinion speculative and thus unreliable. As a result, the district court granted summary judgment for Remington. Plaintiff now appeals.

We hold that the district court abused its discretion by excluding Plaintiff's expert, and so we reverse the judgment granting both the motion to exclude and the motion for summary judgment.

## I. BACKGROUND

This case results from the tragic death of 49-year-old Kenneth Seamon. On November 26, 2011, Mr. Seamon was deer hunting alone in Autauga County, Alabama. After Mr. Seamon failed to respond to text messages from his wife and daughter, his son-in-law went to investigate and found Mr. Seamon dead in his elevated tree stand with a single gunshot wound to his chest. Law enforcement officers found Mr. Seamon's rifle on the ground thirteen feet below the tree stand; there was a rope attached to the rifle with carabiners and wrapped around the rifle's scope and safety. The rifle's safety mechanism was off, there was a spent cartridge casing in the rifle's chamber, and there was no gunshot residue on Mr. Seamon's body or clothing, which led responding officers to conclude that the rifle was at least five to ten feet away from Mr. Seamon when it fired. Moreover, Mr.

2

Seamon's left hand was clenched around the front rail of his tree stand, while his right hand was positioned as if he had been grasping something. There are no known witnesses to the shooting. The question, therefore, is a veritable whodunit: what caused the rifle to fire?

Plaintiff-Appellant Cynthia Seamon ("Plaintiff" or "Appellant") – individually and as Personal Representative of the Estate of Kenneth Seamon – filed suit against Defendant-Appellee Remington Arms Company, LLC ("Defendant" or "Appellee"), in the Middle District of Alabama. Plaintiff, Mr. Seamon's widow, alleged that Mr. Seamon died as a result of a defect in his Remington Model 700 bolt action rifle.

Both parties filed motions for summary judgment.  Defendant also filed a motion to exclude the causation opinion of Plaintiff's liability expert, Charles Powell, who had concluded that the rifle fired due to a defect in its trigger system. The district court issued an opinion and order granting both of Defendant's motions and denying Plaintiff's motion. The court then entered final judgment in favor of Defendant and against Plaintiff. Plaintiff filed a motion for reconsideration, which the court denied.

Plaintiff now appeals, arguing that the district court erred both by excluding Powell's causation opinion and by granting Defendant's motion for summary judgment.

A proper analysis of the issues at stake requires detailed understandings of both the rifle's trigger system and Powell's opinion:

The Remington Model 700 rifle contains the Walker fire control system, named for its inventor. Critical in this case are two particular components of the system – the "connector" and the "sear." In firearms, the sear is the part of the trigger mechanism that holds back the firing pin. In the Walker system, unlike other trigger systems, a connector supports the sear by resting under it. When the trigger is pulled, the connector moves forward, allowing the sear to drop and the firing pin to snap forward and fire a cartridge.

The place at which the connector and the sear meet is called the "sear engagement." Because the connection occurs at the corners of these two components, the sear engagement is very small – roughly 0.025" (or less), according to rifle specifications. In other words, the connector supports the sear by roughly one-fortieth of an inch. As a result, even very slight movement of the connector allows the sear to drop and the rifle to fire.

According to Powell, rifles with Walker triggers have fired unexpectedly "a number of times in historical testing and experiences reported in documents produced by Remington Arms."[1] In Powell's view, the use of the connector is a

---

[1]    For further discussion of the Walker trigger system and its checkered history, see O'Neal v. Remington Arms Co., LLC, 803 F.3d 974 (8th Cir. 2015), a case involving the same expert witness (Charles Powell) and the same rifle model (Remington Model 700) as in this case. In

4

design defect in the Walker system because the connector "does not reliably return to full engagement with the [s]ear each time the rifle bolt is cocked." If the connector does not fully return to its proper position supporting the sear, the sear can drop when it should not – which, in turn, causes the rifle to fire.

What causes the connector to fail to return to its proper position is the presence of "interferences" within the fire control housing. Powell's examples of interferences include dirt, corrosion deposits, condensation, frozen moisture, lubricant deposits, firing deposits, and manufacturing residue. Because the sear engagement is very small even when the rifle is in perfect condition, the presence of even minute particles can prevent the connector from engaging the sear correctly. When this occurs, the connector's position is precarious enough that if the rifle comes into contact with any external forces – anything that is not the rifle itself – the connector can fall out of place, causing the sear to drop and the rifle to fire, even without a trigger pull.

Because Powell found particles and deposits within the fire control housing during his examination of the rifle – the types of particles and deposits "that have been shown to be sources of interferences for the connector sear engagement" in other rifles with Walker systems – he believes that in this case, "interferences with

---

O'Neal, the Eighth Circuit determined, among other things, that for the purposes of summary judgment, the evidence was sufficient to show that any rifle with a Walker trigger system "is defective and not fit for its ordinary purpose." Id. at 979.

the fire control components produced inadequate sear-connector engagement and allowed the subject rifle to release the firing pin and fire the subject rifle without any interaction with the trigger." He further believes that the firing may have been spurred by a "jar-off" – meaning that the rifle contacted an external force like the tree, rope, or ground, and the connector was further jarred out of position, allowing the rifle to fire.

Additionally, when Powell examined the rifle, the sear engagement was still at a safe level even despite the presence of particles and deposits. In fact, he stated during his deposition that when examining this type of rifle after an inadvertent firing, he has never seen a precipitous sear engagement due to interferences. However, he believes that he has not observed such conditions because by the time he receives a rifle for inspection, the rifle's actions have worked and the conditions are no longer the same as they were before the rifle fired. In other words, the fact that he has not seen a dangerously low sear engagement due to interferences after a rifle allegedly fired without a trigger pull does not mean those conditions did not exist before the rifle fired.

The district court excluded Powell's opinion, finding that it was speculative and thus unreliable.

6

## II. STANDARDS OF REVIEW

We review the district court's exclusion of expert testimony for abuse of discretion. Rink v. Cheminova, Inc., 400 F.3d 1286, 1291 (11th Cir. 2005). Under this standard, we reverse only if the district court "applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous." Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1096 (11th Cir. 2004) (quoting Martin v. Automobili Lamborghini Exclusive, Inc., 307 F.3d 1332, 1336 (11th Cir. 2002)). In the Daubert context, we defer to the district court's ruling unless it is "manifestly erroneous." Id. "Because the task of evaluating the reliability of expert testimony is uniquely entrusted to the district court . . ., we give the district court 'considerable leeway' in the execution of its duty." Id. (quoting Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999)) (citation omitted).

We review the district court's ruling on a motion for summary judgment de novo, applying the same legal standards that bound the district court. Nat'l Fire Ins. Co. of Hartford v. Fortune Constr. Co., 320 F.3d 1260, 1267 (11th Cir. 2003). Motions for summary judgment should be granted only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c);

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

### III. DISCUSSION

*A. Motion to Exclude Expert Testimony*

Federal Rule of Evidence 702 governs the admissibility of expert testimony.

It provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 compels district courts to perform a "gatekeeping" role concerning

the admissibility of expert testimony. Daubert v. Merrell Dow Pharm., Inc., 509

U.S. 579, 597 (1993); Kumho, 526 U.S. at 141. Courts must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of

8

> inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998) (footnote omitted).

As to the first prong – qualifications – "experts may be qualified in various ways," including by scientific training, education, and experience. United States v. Frazier, 387 F.3d 1244, 1260-61 (11th Cir. 2004).

The second prong – reliability – concerns "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 592-93. The district court may consider "(1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the technique has been generally accepted in the proper scientific community." McDowell v. Brown, 392 F.3d 1283, 1298 (11th Cir. 2004) (citing Daubert, 509 U.S. at 593-94). This list is not exhaustive; the district court may take other relevant factors into account. In assessing reliability, the court must focus "solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595.

Finally, the third prong – helpfulness, or fit – "goes primarily to relevance." Id. at 591. "The 'basic standard of relevance . . . is a liberal one,' but if an expert opinion does not have a 'valid scientific connection to the pertinent inquiry' it should be excluded because there is no 'fit.'" Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp., 582 F.3d 1227, 1232 (11th Cir. 2009) (quoting Daubert, 509 U.S. at 587, 591-92).

This case involves the second prong: reliability. The district court determined that Powell's opinion is unreliable for two reasons: (1) Powell had not adequately accounted for possible alternative causes of the shooting; and (2) Powell had formed his opinions based upon facts not in the record. We hold that both of these conclusions are manifestly erroneous because they mischaracterize Powell's opinion and the evidence supporting it, and thus that the district court abused its discretion by excluding Powell's testimony. See Adams v. Lab. Corp. of Am., 760 F.3d 1322, 1328-29 (11th Cir. 2014) (holding that it was manifestly erroneous for the district court to exclude an expert on the basis that her opinion was "an ipse dixit assessment," when the record was to the contrary); United States v. Alabama Power Co., 730 F.3d 1278, 1284-88 (11th Cir. 2013) (holding that the exclusion of an expert was an abuse of discretion because the district court mischaracterized the evidence supporting the expert's opinion); United Fire & Cas. Co. v. Whirlpool Corp., 704 F.3d 1338, 1341-42 (11th Cir. 2013) (reversing the

10

exclusion of a portion of an expert's testimony because the district court had failed to consider the evidence supporting that opinion).

### 1. Powell's Treatment of Alternative Causes

Contrary to the district court's conclusion, it is evident from the record that Powell did in fact "provide a reasonable explanation as to why he 'has concluded that [any alternative cause suggested by the defense] was not the sole cause' of the plaintiff's injury." Guinn v. AstraZeneca Pharm. LP, 602 F.3d 1245, 1253 (11th Cir. 2010) (alteration in original) (quoting Best v. Lowe's Home Ctrs., Inc., 563 F.3d 171, 179 (6th Cir. 2009)). When asked during his deposition about Defendant's theory that the rifle fired due to a trigger pull, either by Mr. Seamon or someone else, Powell responded, "I don't have any evidence that the trigger was pulled in this case. In fact, the evidence is just to the contrary, that the rifle was being raised or lowered at the time and it went off." The record supports this conclusion. The lack of gunshot residue on Mr. Seamon suggests that he did not pull the trigger himself. The position of his body – his left hand grasping the tree stand, his right hand positioned as if it were grasping the rope – suggests that someone else did not come along and pull the trigger, but rather that he was in the process of raising or lowering the rifle. The position of the rope – wrapped around the scope and the safety – also suggests that the rope did not pull the trigger. And there appeared to be no branches or other objects which could have caught the

11

trigger between the tree stand and the ground. Given the evidence, therefore, Powell did provide a reasonable explanation for why the defense's proposed alternative cause – a trigger pull – was not in fact the cause of Mr. Seamon's death.

### 2. Factual Support for Powell's Opinion

In holding that Powell's opinion was based on speculation, rather than facts in the record, the district court also mischaracterized the evidentiary support for Powell's opinion in several ways.

First, the district court conflated reasonable inference with improper speculation when considering the circumstances of the shooting:

> Is it possible that Mr. Seamon lost his grip on the rope and that the rifle crashed onto the ground? Is it possible that Mr. Seamon snatched the rope, which jolted the rifle? Is it possible that Mr. Seamon raised or lowered the rifle with gentle ease? Is it possible that someone else shot Mr. Seamon with his own rifle? All of these factual possibilities and any number of others are unanswered by the evidence and, thus, fall within the realm of the unknown. This goes to show that Plaintiff has not shown how the record supports the inferences upon which Mr. Powell relies for his opinion testimony that this case "may have been a jar off." "May not have been" is an equally plausible inference.

Seamon v. Remington Arms Co., LLC, 51 F. Supp. 3d 1198, 1213-14 (M.D. Ala. 2014). While it is true, as the district court noted, that there is no affirmative evidence of a jar-off – evidence which cannot exist, under the circumstances of this case – the evidence here is inconsistent with the defendant's theory (a trigger pull)

12

and fully consistent with Powell's jar-off theory. Under these circumstances, it was not speculative or unreasonable, as the district court stated,[2] for Powell to infer that a jar-off occurred. Moreover, even if the district court had been correct in its determination that a trigger pull and Powell's theory are "equally plausible," that finding would not be a basis for the exclusion of Powell's opinion. Once an expert opinion has satisfied Daubert, a court may not exclude the opinion simply because it believes that the opinion is not – in its view – particularly strong or persuasive. The weight to be given to admissible expert testimony is a matter for the jury. See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003) ("[I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence. . . . Quite the contrary, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" (quoting Daubert, 509 U.S. at 596) (third alteration in original)).

Second, the district court incorrectly stated that Powell "was unable to replicate a 'jar off' in his testing and inspection of the subject rifle." Seamon, 51 F. Supp. 3d at 1214. At his deposition, Powell in fact clarified that he did not attempt to conduct a jar-off test on the rifle at issue because by the time he received the

---

[2]    Seamon, 51 F. Supp. 3d at 1213.

13

rifle, the sear engagement was not low enough to necessitate such a test. Importantly, the fact that the sear engagement was safe at the time of Powell's examination does not prove that it was also safe before the rifle fired, because the placement of the sear would necessarily be different before and after the rifle fired. Accordingly, it was clearly erroneous for the district court to effectively draw an adverse inference from the alleged failure of Powell's testing, when he did not conduct that test in the first place because the condition of the sear engagement would have made it a fruitless enterprise.

Finally, the district court also noted that there was no evidence of interferences causing a precipitously low sear engagement at the time the rifle fired.[3] That observation is partially correct, as it is simply impossible to know the precise positioning of the sear in the moments before the rifle fired. But Powell did find debris in the fire control housing – the type of debris that he previously has observed interfering with the sear engagement in the same type of rifle. Under these circumstances – where evidence also suggests the trigger was not pulled and the only other possibility is that the rifle fired without a trigger pull – it does not

---

[3]    The district court also discussed (and discounted) an alternative theory: that the sear engagement was precipitously low, such that the rifle could fire if jarred, due to a previous partial trigger pull from which the sear engagement had not recovered. Powell's opinion, however, did not rest on this theory. Rather, he merely acknowledged during his deposition that such a scenario was possible, particularly because the rifle had failed regain tests – meaning that the connector did not fully return to its proper position after a partial trigger pull.

14

require "a metaphysical process"[4] to infer that the debris in the fire control housing created the condition (a precipitous sear engagement) that would have allowed the rifle to fire upon being jarred. Moreover, the district court incorrectly stated in its discussion of interferences that Powell "has never seen the condition he proposes existed in this rifle at the time of the shooting." Seamon, 51 F. Supp. 3d. at 1214. What Powell actually testified to is that he has never seen this condition in a Model 700 accident rifle – that is, a rifle that has allegedly fired without a pull of the trigger – because by the time he receives an accident rifle for examination, the debris or deposits that would have interfered with the sear's position have necessarily been dislodged through the firing of the rifle. Powell did state that he has observed interferences creating low sear engagements in non-accident rifles with Walker trigger systems.

Under these circumstances, we hold that the district court manifestly erred by mischaracterizing Powell's opinion and the evidence supporting it, and thus that it was an abuse of discretion for the district court to exclude Powell's testimony.

*B. Motion for Summary Judgment*

As the district court recognized, Defendant's motion for summary judgment relied entirely on its motion to exclude Powell's opinion; the district court's summary judgment decision thus rested entirely on its exclusion of Powell's

---

4    Seamon, 51 F. Supp. 3d at 1214.

15

testimony. Therefore, because we reverse the district court's decision to grant the motion to exclude, we also reverse the court's decision to grant Defendant's motion for summary judgment.

## IV. CONCLUSION

For the foregoing reasons, we reverse the district court's order granting Defendant's motion to exclude expert testimony and motion for summary judgment, and vacate the judgment entered for Defendant. The case is remanded to the district court for further proceedings consistent with this opinion.

**REVERSED.**

16