[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-12897
Non-Argument Calendar

_____

D.C. Docket No. 1:17-cr-00196-JB-MU-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CHRISTOPHER SHANE DREILING,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

(April 3, 2020)

Before MARTIN, ROSENBAUM, and EDMONDSON, Circuit Judges.

PER CURIAM:

Christopher Dreiling appeals his convictions for assault with intent to commit murder, in violation of 18 U.S.C. § 113(a)(1).  No reversible error has been shown; we affirm.

This appeal arises from events that occurred on a small commercial fishing vessel while offshore in the Gulf of Mexico.  The crew onboard the vessel consisted of three men: Noah Gibson (the boat's captain), A.J. Love, and Dreiling.  As Gibson and Love fished, Dreiling -- with no warning or apparent provocation -- attacked Gibson from behind, stabbing Gibson in the back with a knife.  As Gibson tried to jump off the boat, Dreiling stabbed Gibson again behind the ear and down the side of Gibson's face.  Gibson then succeeded in jumping overboard and swam to a stabilizing chain that was in the water, about 25 feet away from the boat.

Dreiling then turned his attention to Love.  Love testified that Dreiling twice stabbed him in the side with the entire six-inch-long knife blade.  In total, Love sustained more than twelve lacerations to his hand, arm, sides, legs, back, and face.  During the attack, Love begged Dreiling not to kill him because Love had a wife and kids.  In response, Dreiling said that he was going to kill Love unless Love

2

jumped overboard.  Love then said to Dreiling that "the sharks are going to eat us," to which Dreiling responded, "I know they are."  Love ultimately jumped overboard and swam over to join Gibson.

After the attacks, Dreiling called the Coast Guard to report that he had stabbed two people who needed help and also to request assistance in getting himself off the boat.  Dreiling told the Coast Guard that he believed the two men had been planning to kill him and that Dreiling needed to get away from them.  At Gibson's request, Dreiling also provided Gibson and Love with an emergency positioning beacon, a life raft, and some drinking water.

The Coast Guard arrived on the scene and transported all three men back to shore.  Gibson and Love received immediate medical care; both men survived.

Once on shore, Dreiling was interviewed by a Coast Guard investigator. During the interview, Dreiling said he believed that Gibson and Love had been plotting to kill him and that he wanted to get the men off the boat before they harmed him.  Dreiling said he needed to do "whatever it takes" to protect himself and that, before the attacks, he prayed that God would forgive him and prayed for Gibson and Love.  In planning his attack, Dreiling explained that he decided to target Gibson first because he thought Gibson had a gun on his person.  Dreiling

3

also said he knew Love would put up a fight, so Dreiling "needed to hit [Gibson] quick" to conserve his energy to fight Love.

At trial, Dreiling asserted an insanity defense.[1] Dr. Shaffer, a clinical psychologist and neuropsychologist, testified as the sole witness for the defense. Dr. Shaffer testified about Dreiling's history of physical head traumas, childhood trauma, and psychological disorders. Dr. Shaffer opined that, during the attacks, Dreiling was likely experiencing a "garden variety paranoid delusion." Dr. Shaffer also said that Dreiling's prayer before the attacks "showed that he had tremendous internal conflict going on and that he realized that what he would have to do to survive meant inflicting harm on someone else."

As a rebuttal witness, the government called Dr. Campbell, a forensic psychologist with the Federal Bureau of Prisons. Dr. Campbell diagnosed Dreiling with paranoid personality disorder, antisocial personality disorder, and alcohol and drug-related disorders. Dr. Campbell opined that, although those disorders might explain Dreiling's behavior during the attacks, Dreiling "never lost contact with reality in that he knew he was fixing to injure these guys, potentially maybe kill them."

---

[1] Following a competency hearing, the district court found Dreiling competent to stand trial. Dreiling raises no challenge to that determination on appeal.

4

The jury found Dreiling guilty of the charged offenses.  The district court later sentenced Dreiling to 30 years' imprisonment.

On appeal, Dreiling challenges the district court's denial of his motions for judgment of acquittal.  Dreiling contends that the evidence presented at trial was insufficient to permit a jury to find that Dreiling had the requisite specific intent to murder Gibson and Love.  First, Dreiling asserts that the evidence shows he was suffering from a paranoid delusion that rendered him unable to form the requisite intent.[2]  Dreiling also contends that his conduct demonstrates that he lacked an intent to commit murder.

"We review de novo a district court's denial of judgment of acquittal on sufficiency of the evidence grounds."  United States v. Rodriguez, 732 F.3d 1299, 1303 (11th Cir. 2013).  In determining the sufficiency of the evidence, "we consider the evidence in the light most favorable to the government, drawing all reasonable inferences and credibility choices in the government's favor."  Id.  We cannot overturn a jury's verdict unless no "reasonable construction of the evidence

---

[2] On appeal, Dreiling makes no argument reasserting directly his insanity affirmative defense. Dreiling contends, instead, that -- in the light of the evidence of his mental illness -- the government failed to satisfy its burden of proving the intent element of the offense.  For background, see United States v. Cameron, 907 F.2d 1051, 1066-67 (11th Cir. 1990) (recognizing that evidence of mental illness may be admitted to negate specific intent only under limited circumstances but stressing that such evidence "will only rarely negate specific intent.").

5

would have allowed the jury to find the defendant guilty beyond a reasonable doubt." Id.

Because the "jury is free to choose among reasonable constructions of the evidence," the government need not "disprove every reasonable hypothesis of innocence." United States v. Foster, 878 F.3d 1297, 1304 (11th Cir. 2018) (quotations omitted). "[W]hen the government relies on circumstantial evidence, the conviction must be supported by reasonable inferences, not mere speculation." Rodriguez, 732 F.3d at 1303.

To obtain a conviction for assault with intent to commit murder, in violation of section 113(a)(1), the government must prove that the defendant (1) assaulted another person, (2) with specific intent to commit murder, (3) while within the special maritime and territorial jurisdiction of the United States. See 18 U.S.C. § 113(a)(1); United States v. Williams, 197 F.3d 1091, 1096 (11th Cir. 1999) (describing section 113(a)(1) as containing a specific intent requirement). That Dreiling's conduct constituted an "assault" and that the pertinent events occurred within the maritime jurisdiction of the United States are undisputed. On appeal, Dreiling challenges only the second element: that he acted with specific intent to murder Gibson and Love.

6

Generally speaking, "[a] defendant's intent can be inferred from his conduct and all the surrounding circumstances." United States v. Vigil-Montanel, 753 F.2d 996, 999 (11th Cir. 1985). About an offense under section 113(a), we have said that a defendant's intent "is not to be measured by the secret motive of the actor, or some undisclosed purpose merely to frighten, not to hurt, but rather is to be judged objectively from the visible conduct of the actor and what one in the position of the victim might reasonably conclude." See United States v. Guilbert, 692 F.2d 1340, 1344 (11th Cir. 1982) (quotations omitted).

Viewed in the light most favorable to the government, the evidence presented at trial was sufficient to permit a reasonable factfinder to conclude beyond a reasonable doubt that Dreiling acted with intent to murder Gibson and Love. The evidence shows that Dreiling launched a pre-planned attack on Gibson and Love, stabbing each man several times. The location and severity of the stab wounds -- deep cuts to the back, torso, and face -- support a finding that Dreiling intended to inflict fatal injuries, rather than merely to frighten or threaten Gibson and Love. That Dreiling continued to stab at Gibson even after Gibson first attempted to jump overboard also contradicts Dreiling's assertion that he intended only to get the men off the boat.

7

Dreiling's comments during the attack also evidence an intent to kill. Cf. Guilbert, 692 F.2d at 1344 (defendant's spoken threats that he was going to kill the victim while attempting to strike or stab the victim was "more than sufficient" to demonstrate the defendant's intent to inflict bodily harm). Dreiling told Love expressly that he would kill Love unless Love jumped overboard. When Love told Dreiling that he would be eaten by sharks if he jumped into the water, Dreiling said "I know." In addition, Gibson's and Love's testimony that they were frightened and believed that Dreiling intended to kill them further evidenced Dreiling's intent to murder. See id. (a defendant's intent is judged objectively from "what one in the position of the victim might reasonably conclude.").

On appeal, Dreiling first argues based on Dr. Shaffer's testimony that he was experiencing a paranoid delusion during the attacks that prevented him from forming the specific intent to kill. Dr. Campbell opined, however, that Dreiling never lost complete touch with reality. According to Dr. Campbell, even if Dreiling believed that Gibson and Love were plotting to kill him as part of a paranoid delusion, Dreiling still intended to kill Gibson and Love. In a similar way, Dr. Shaffer also testified that Dreiling faced an "internal conflict" because Dreiling knew that he would have to harm Gibson and Love to protect his own safety.

8

Viewing this evidence in the light most favorable to the government, a reasonable jury could have concluded that Dreiling was still able to form an intent to kill even if experiencing a paranoid delusion. To the extent the testimony of Dr. Shaffer and Dr. Campbell conflicted, the jury "was free to accept or reject the testimony of either expert." See United States v. Figueroa, 666 F.2d 1375, 1377 (11th Cir. 1982); see also Seamon v. Remington Arms Co., LLC (In re Estate of Seamon), 813 F.3d 983, 990 (11th Cir. 2016) ("The weight to be given to admissible expert testimony is a matter for the jury."). Moreover, a jury need not give dispositive weight to evidence of a defendant's mental illness where other evidence supports a reasonable finding that the defendant acted with the requisite specific intent. See United States v. Revel, 971 F.2d 656, 659 (11th Cir. 1992) (despite evidence of defendant's history of schizophrenia that could have affected his ability to form the requisite intent, the jury -- based on other evidence in the record -- concluded reasonably that defendant acted with specific intent to join the conspiracy).

Dreiling also argues that his conduct immediately following the attacks demonstrated that he lacked the intent to murder Gibson and Love. In particular, Dreiling points to evidence (1) that he stopped voluntarily the attacks once the men jumped overboard even though Dreiling had access to a gun, (2) that Dreiling

9

allowed Love to escape by jumping overboard, and (3) that Dreiling aided the men once they were overboard by calling the Coast Guard and by providing them with essential supplies.  Dreiling also told the Coast Guard officers repeatedly that he just wanted to get away from Gibson and Love, not to kill them.

Other evidence in the record, however, supports the jury's rejection of Dreiling's version of the facts.  Contrary to Dreiling's assertion that he stopped voluntarily the attacks and allowed Love to escape, the record also showed that Dreiling knew that Gibson and Love were at serious risk of dying while overboard -- either from their wounds or from a shark attack -- even without Dreiling delivering the final blow.  The government also presented evidence that Dreiling was unable to operate the boat, the radio, or the boat's positioning system by himself and, thus, might have called the Coast Guard at least in part for his own benefit.

Because the evidence produced at trial was sufficient to allow the jury to find Dreiling guilty beyond a reasonable doubt, the district court committed no error in denying Dreiling's motions for a judgment of acquittal.

AFFIRMED.

10