# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
January 6, 2022

Lyle W. Cayce
Clerk

No. 17-30499

Precious Seguin,

*Plaintiff—Appellee*,

*versus*

Remington Arms Company, L.L.C.,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:14-CV-2442

Before Owen, *Chief Judge*, and Dennis and Southwick, *Circuit Judges*.

Leslie H. Southwick, *Circuit Judge*:

Precious Seguin was shot in the hip during a hunting accident when her father's firearm accidentally discharged. Seguin claimed that a faulty design caused the discharge, and she sued the firearm manufacturer for defective design under Louisiana law. This case presents the limited question of whether Louisiana Revised Statute § 9:2800.60, which limits certain products liability claims against firearms manufacturers and sellers, bars Seguin's claim. At summary judgment, the district court held that it did not and entered judgment for Seguin.

No. 17-30499

The required interpretation of the controlling Louisiana statute presents unresolved and difficult questions of state law. We therefore CERTIFY the relevant question to the Louisiana Supreme Court, requesting that it provide us a definitive answer.

Before addressing the reasons for certification, we must consider an issue of our jurisdiction. Absent jurisdiction, we have no basis for any ruling beyond what is needed to dismiss. The complaint filed in the United States District Court for the Eastern District of Louisiana alleged there was diversity jurisdiction over the defendant manufacturer, Remington Arms Company, L.L.C. The parties now agree that the complaint did not make accurate assertions about Remington's citizenship. We explain.

Diversity jurisdiction exists where "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States." 28 U.S.C. § 1332(a). The complaint stated that the plaintiffs were citizens of Louisiana and that Remington was a company incorporated in Delaware with its principal place of business in North Carolina. Instead, Remington is a limited liability company whose citizenship is determined by the citizenship of each its members. As we will later explain, the states of Remington's citizenship — Delaware and North Carolina — were accurately identified in this complaint, but the reasons those were the correct states were inaccurately detailed.

The citizenship of the parties must be "distinctly and affirmatively alleged," which means alleged in the complaint. *Getty Oil Corp. v. Insurance Co. of N. Am.*, 841 F.2d 1254, 1259 (5th Cir. 1988) (quoting *McGovern v. American Airlines, Inc.*, 511 F.2d 653, 654 (5th Cir. 1975)). Failure to plead correctly is not necessarily fatal to the suit. "Defective allegations of jurisdiction may be amended . . . in the trial or appellate courts." 28 U.S.C. § 1653. Whether a formal amendment is needed once the case is on appeal,

and the significance of whether jurisdictional facts appear in the record when they were not asserted in the complaint, have been analyzed in many precedents.

One approach taken by the Supreme Court, before the current statute regarding amendments was adopted in 1948, was to rely on concessions by the parties as opposed to record evidence after the plaintiff had insufficiently alleged the defendant's citizenship in the complaint. *Realty Holding Co. v. Donaldson*, 268 U.S. 398, 399–400 (1925). The Court declined to remand to district court to remedy the error because the defendant had "conceded . . . that she was in fact a citizen of Michigan; and the court below assumed the point." *Id.* at 400. The Court continued: "Since the defect may be cured by amendment and nothing is to be gained by sending the case back for that purpose, we shall consider the amendment made and dispose of the case." *Id.* Though the Court did not cite the predecessor statute to Section 1653, its reference to curing the defect by amendment likely was referring to the first version of the statute, adopted in 1915, which provided that when "diverse citizenship in fact existed at the time the suit was brought or removed, though defectively alleged, either party may amend at any stage of the proceedings and in the appellate court upon such terms as the court may impose." Act of March 3, 1915, ch. 90, 38 Stat. 956 (1915); *see Newman-Green, Inc. v. Alfonzo-Larrain,* 490 U.S. 826, 831 (1989). Later, in a case in which the complaint made no allegation about the amount in controversy, the Court stated it was conceded that the necessary amount was satisfied; because of the court's "disposition of the case," which was to reverse and render, "no purpose would be served by requiring a formal amendment" under Section 1653. *Schlesinger v. Councilman*, 420 U.S. 738, 744 n. 9 (1975).

We have followed different approaches when the complaint fails to allege jurisdiction properly. In an early opinion after the adoption of the current statute on amendments, this court *sua sponte* noted the complaint's

failure to allege diverse citizenship sufficiently. *See Kaufman v. Western Union Tel. Co.*, 224 F.2d 723, 725 (5th Cir. 1955). The court resolved the appeal on the merits by relying on information outside the lower-court record but required the plaintiff to file an amended complaint in this court within ten days after the court's decision. *Id.* A slightly later opinion from our court cited *Kaufman* and held that allowing an amendment on appeal to the assertions of jurisdiction in a petition for removal was proper when the truth of the revisions was conceded by the other party. *Firemen's Ins. Co. v. Robbins Coal Co.*, 288 F.2d 349, 350 (5th Cir. 1961).

One opinion attempted to systematize our precedent by stating that "[w]here jurisdiction is clear from the record, this Court has allowed direct amendments to the pleadings without a remand." *Molett v. Penrod Drilling Co.*, 872 F.2d 1221, 1228 (5th Cir. 1989). When the record is less clear "but there is some reason to believe that jurisdiction exists, the Court may remand the case to the district court for amendment of the allegations and for the record to be supplemented." *Id.* A recent remand for a district court to examine citizenship in the absence of any record evidence is *Midcap Media Finance, L.L.C. v. Pathway Data, Inc.*, 929 F.3d 310 (5th Cir. 2019).

Examples of declining to remand include one case in which the plaintiffs had failed to allege all relevant facts of citizenship; we granted the plaintiffs' motion to amend the pleadings under Section 1653 "because the record otherwise evidence[d] a substantial likelihood of diverse citizenship." *Nadler v. American Motors Sales Corp.*, 764 F.2d 409, 413 (5th Cir. 1985). In another case, when the parties stipulated to jurisdictional facts "not subject to reasonable dispute" set forth in publicly available documents, we took judicial notice of those facts under Federal Rule of Evidence 201(b)(2) and relied on Section 1653 in declining to remand to remedy a jurisdictional pleading deficiency. *See Swindol v. Aurora Flight Scis. Corp.*, 805 F.3d 516, 519 & n.2 (5th Cir. 2015). Finally, in an earlier appeal involving Remington,

No. 17-30499

we relied on a joint submission by the parties establishing citizenship. *Burdett v. Remington Arms Co.*, 854 F.3d 733, 734 n.1 (5th Cir. 2017).

These opinions may well not be entirely consistent, but they reflect approaches this court has followed. As we were considering our options, we required the parties in this appeal to state if they could agree on Remington's citizenship. They could, as shown in this excerpt from their joint letter:

> Remington is a Delaware limited liability company with its principal place of business in North Carolina. Remington filed a Corporate Disclosure Statement in the underlying matter on December 24, 2014. (D.E. 11), providing that the sole member of Remington is FGI Operating Company, LLC, and no publicly traded corporation owns ten percent (10%) or more of its stock.

The parties further agreed to this:

> FGI Operating Company, LLC ("FGI Operating") is the sole member of Remington. FGI Operating is a Delaware limited liability company with its principal place of business in North Carolina. FGI Holding Company, LLC ("FGI Holding") is the sole member of FGI Operating. FGI Holding is a Delaware limited liability company with its principal place of business in North Carolina. Remington Outdoor Company, Inc. is the sole member of FGI Holding. Remington Outdoor Company, Inc. is a Delaware corporation with its principal place of business in North Carolina.

We conclude that a substantial likelihood of diversity was supported by the record. First, the complaint alleged the correct states for citizenship but did not properly explain why they were correct. Second, the recent joint letter cited a disclosure statement filed in district court by Remington in 2014 that detailed most of the relevant information on citizenship. The likelihood of diversity is now known to be a reality due to the joint letter. After receiving

No. 17-30499

the letter, we required the Plaintiff to file an amended complaint. Plaintiff did, and the current complaint properly asserts diverse citizenship.

Having assured ourselves of jurisdiction, we now return to the reasons for certification. We may certify an unsettled question of state law to a state's highest court when that court has a procedure permitting such questions to be posed. *See* 17A Charles Alan Wright, et al., Federal Practice & Procedure § 4248 (3d ed. 2015). The Louisiana Supreme Court has such a procedural rule. *See* La. Sup. Ct. R. XII, § 1.

Because this appeal turns on a novel question of Louisiana statutory interpretation that neither the Louisiana Supreme Court nor any lower Louisiana court has answered, we now certify the question stated below to the Louisiana Supreme Court.

Certificate from the United States Court of Appeals for the Fifth Circuit to the Supreme Court of Louisiana, Pursuant to Rule XII, Louisiana Supreme Court Rules.

To the Supreme Court of Louisiana and the Honorable Justices Thereof:

## I. STYLE OF THE CASE

The style of the case in which certification is made is *Precious Seguin v. Remington Arms Company, L.L.C.*, No. 17-30499, in the United States Court of Appeals for the Fifth Circuit, on appeal from the United States District Court for the Eastern District of Louisiana.

## II. STATEMENT OF FACTS

Seguin, her father, and two others were tracking a wounded deer at night in the woods near Loranger, Louisiana, when her father's firearm accidentally discharged, injuring Seguin. Seguin believed that a faulty design caused the accidental discharge, so she brought a Louisiana products liability

action against Remington Arms Co., L.L.C. ("Remington") to recover for her injuries.

Before trial, the parties filed a Joint Statement of Uncontested Material Facts and cross-motions for summary judgment. The statement of facts included several stipulations related to the Louisiana Products Liability Act ("LPLA"). La. Stat. Ann. §§ 9:2800.51–60. The parties stipulated that the LPLA exclusively governs Seguin's claims. Remington is a "firearms manufacturer" under Section 60; Seguin is a "claimant" under Section 53(4); and Seguin's only products liability claim was for a design defect under Section 56 and not for a manufacturing defect under Section 55. Based on these stipulations, the district court concluded that summary judgment turned on a single statutory interpretation question: Does LPLA Section 60(B) permit Seguin to recover for a design defect claim against Remington?

The district court held that Section 60(B) did not bar Seguin's Section 9:2800.56 design-defect claim against Remington. The court reasoned that Section 60(B) was susceptible to two interpretations and was thus ambiguous. The court also determined that applying either interpretation would lead to an absurd result. As a result of that conclusion, the district court considered the legislative intent and history of Section 60(B) and found that its purpose was not to preclude legitimate design defect claims. It thus granted summary judgment for Seguin on her design defect claim, dismissed her remaining claims with prejudice, and entered final judgment in her favor for $500,000. Remington timely appealed.

## III. The Question of Law

The issue on appeal is whether the district court erred when it held that Section 60(B), part of a 1999 amendment to the LPLA, did not bar Seguin from bringing a design defect products liability claim against

No. 17-30499

Remington, a firearms manufacturer. The LPLA "establishes the exclusive theories of liability for manufacturers for damage caused by their products." LA. STAT. ANN. § 9:2800.52. A claimant may recover from a manufacturer for injuries from an unreasonably dangerous product. *Id.* § 9:2800.54(A). A product is unreasonably dangerous under that statute if:

> (1) The product is unreasonably dangerous in construction or composition as provided in R.S. 9:2800.55;
>
> (2) The product is unreasonably dangerous in design as provided in R.S. 9:2800.56;
>
> (3) The product is unreasonably dangerous because an adequate warning about the product has not been provided as provided in R.S. 9:2800.57; or
>
> (4) The product is unreasonably dangerous because it does not conform to an express warranty of the manufacturer about the product as provided in R.S. 9:2800.58.

*Id.* § 9:2800.54(B).

The Louisiana Legislature amended the LPLA to limit products liability actions against firearm manufacturers. The amendment is codified in Section 60 of the LPLA. *Id.* § 9:2800.60. This appeal focuses on Section 60(B) of that provision, which provides:

> No firearm manufacturer or seller shall be liable for any injury, damage, or death resulting from any shooting injury by any other person unless the claimant proves and shows that such injury, damage, or death was proximately caused by the unreasonably dangerous construction or composition of the product as provided in R.S. 9:2800.55.

*Id.* § 9:2800.60(B). On appeal, Remington argues that, under the facts of this case, Section 60(B) plainly shields the company from all product liability theories except for a manufacturing defect claim under Section 55. Since

8

Seguin had stipulated that her only claim was for a design defect under Section 56, Remington concludes it was entitled to summary judgment.

Seguin does not dispute that Section 60(B), interpreted literally, precludes her design defect claim. Instead, she argues that if Section 60(B) precludes Section 56 design defect claims, then subsections 60(C)–(F), which address other aspects of a firearm manufacturers' or sellers' liability, would be superfluous. Seguin contends that any effort to interpret these different sections in a consistent manner reveals that Section 60(B) is ambiguous. Consequently, the court should consider legislative history, and that allowing Section 56 design defect claims against firearm manufacturers would be more consistent with legislative intent. Perhaps most fundamentally, though, Seguin also argues that either possible literal interpretation of the statute would be absurd.

The question of whether Section 9:2800.60(B) bars Section 56 design defect claims against firearm manufacturers presents an issue of state law that is unanswered by the Louisiana courts, so we invoke Louisiana Supreme Court Rule XII and certify this question to the Louisiana Supreme Court. *See* La. Sup. Ct. R. XXI § 1.

## IV. QUESTION THAT WE CERTIFY

We certify the following question of law to the Supreme Court of Louisiana: Does § 9:2800.60(B) of the Louisiana Products Liability Act bar an individual, who is shot and injured by a third-party, from bringing a design defect claim under § 9:2800.56 against a firearm manufacturer or seller?

If the Louisiana Supreme Court accepts this certificate, its answer will determine the outcome of this appeal. We do not intend to confine the reply of the Supreme Court of Louisiana to the precise form or scope of the question certified.   QUESTION CERTIFIED.

No. 17-30499

Jᴀᴍᴇs L. Dᴇɴɴɪs, *Circuit Judge*, dissenting:

I respectfully dissent from the majority's certification of its question to the Louisiana Supreme Court. That question— "Does § 9:2800.60(B) of the Louisiana Products Liability Act bar an individual, who is shot and injured by a third-party, from bringing a design defect claim under § 9:2800.56 against a firearm manufacturer or seller?"—is not appropriate for certification because: (1) it is not determinative of this cause independently of any other question involved in this case; and (2) there are clear controlling precedents in the Louisiana Supreme Court decisions that require this court to affirm the district court's judgment without seeking an answer to a novel question that favors a party's litigation position. *See* La. Supreme Court Rule XII, section 1.

The parties in this case, both desiring to avoid the costs of a trial, entered a stipulation that they would file cross-motions for summary judgment, with Seguin relying on her theory of a design defect in the rifle based on her expert's report, and Remington relying on Louisiana Revised Statute § 9:2800.60(B)[1] ("§60(B)"), which effectively requires that a claim against a firearm manufacturer or seller may be pursued or proven only as a construction or composition claim.  Per the stipulation, if the district court granted Remington's motion, judgment would be entered denying all of Seguin's claims; but, if the court granted Seguin's motion instead, judgment would be rendered in her favor in the amount of $500,000, regardless of her

---

[1] §60(B) provides: "No firearm manufacturer or seller shall be liable for any injury, damage, or death resulting from any shooting injury by any other person unless the claimant proves and shows that such injury, damage, or death was proximately caused by the unreasonably dangerous construction or composition of the product as provided in R.S. 9:2800.55."

actual damages. After considering briefs and oral arguments, the district court concluded that applying §60(B) literally would lead to absurd consequences; therefore, the court concluded that Seguin had presented a litigable design defect claim under the Louisiana Products Liability Act ("LPLA"), *see* La. R.S. 9:2800.56, and, in accordance with the parties' stipulation, awarded Seguin $500,000 in damages.

I agree that applying §60(B) literally to the present case would lead to absurd consequences, viz., treating all firearm injury or death claims as if they were construction or composition claims, contrary to the intent of design or warning defect claimants; incentivizing the corrupt efforts of special interest lobbyists; and misshaping the development of Louisiana products liability law in ways that are incongruous and inappropriate to a shocking degree.

The LPLA, enacted in 1988, was the careful result of a compromise between the Louisiana Trial Lawyers Association ("LTLA") and the Louisiana Association of Business and Industry ("LABI"), *see* Thomas Galligan, *The Louisiana Products Liability Act: Making Sense of It All*, 49 LA. L. REV. 629, 637-38 (1989); on the other hand, §60(B) was added eleven years later in 1999. As the district court correctly realized, applying §60(B) literally would lead to absurd consequences. Not only would it totally isolate and protect gun manufacturers from claims for design defects and inadequate warnings, but it would also incentivize the marketing of unsafe firearm products for use in Louisiana, and would deviate sharply from cases in Louisiana and all other states and jurisdictions, as well as from the original LPLA (1988), and from the American Law Institute's ("ALI") Restatements Second and Third of the Law of Torts-Products Liability. To my knowledge, no other state, jurisdiction, or institute has completely insulated firearms manufacturers from design defect and inadequate instruction or warning claims.

By its literal terms, §60(B) provides that no gun manufacturer or seller shall be liable to anyone shot by any other person unless the claimant proves that such injury or death was proximately caused by the construction or composition of the product under La. R.S. 9:2800.55. Thus, applied literally, §60(B) is a double-barreled blunderbuss that denies any claim against a gun maker unless it is proven as a construction or composition claim, a requirement that is no concession or sop:  To prove a gun defective in construction or composition requires a claimant to prove that "the product deviated in a material way from the manufacturer's specifications or performance standards" at the time it left the manufacturer's control. *See* La. R.S. 9:2800.55.

Thus, if a person is harmed by a rifle that discharged without a trigger pull, as Seguin claims, she would not be able to hold the manufacturer liable so long as the rifle met the manufacturer's own specifications when it left the maker or seller's control—even if those specifications included a defectively designed trigger mechanism that can cause the gun to discharge without a trigger pull, and even if, as Seguin's expert Charles Powell wrote in his report, the gun manufacturer's entire product line has such a defectively designed trigger mechanism, and even if the manufacturer has known about the dangerous defect for years.  This is an absurd result, which would aggravate victims' actual losses by grotesquely converting all of their claims into losing manufacturing defect claims.  The manufacturing defect claim under § 9:2800.55 cannot serve to prove a design defect or inadequate instruction or warning claim; the upshot of a literal application of §60(B) to this or similar cases would be defeat of all design and inadequate warning claims against gun manufacturers.

In this respect, a literal application of §60(B) would break sharply with American and Louisiana products liability law, most of which was made initially by courts in common law fashion until the ALI began the

No. 17-30499

Restatements. Louisiana joined this process and adopted its principles starting with *Weber v. Fidelity & Casualty Insurance Company of New York*, 250 So. 2d 754 (La. 1971). It is solidly established in American and Louisiana products liability law that product defects are divided into manufacturing defects, design defects, and defects based on inadequate instructions or warnings. *See* Restatement (Third) of Torts: Products Liability § 1, cmt. a, note 1.[2] The identical division is present in the LPLA, as originally enacted, *see* La. R.S. 9:2800.55–57 (1988), and was established by the Louisiana Supreme Court in pre-LPLA Louisiana products liability jurisprudence. *See Halphen v. Johns-Manville*, 484 So. 2d 110 (La. 1986). This system of three

---

[2] *See, e.g.*, *Caterpillar Tractor Co. v. Beck*, 593 P.2d 871, 881-82 (Alaska 1979); *Dart v. Wiebe Mfg., Inc.*, 709 P.2d 876, 878-79 (Ariz. 1985); *Barker v. Lull Eng'g Co.*, 573 P.2d 443, 454 (Cal. 1978); *Cassisi v. Maytag Co.*, 396 So.2d 1140, 1145 (Fla. Ct. App. 1981); *Hunt v. Harley-Davidson Motor Co.*, 248 S.E.2d 15, 15-17 (Ga. Ct. App. 1978); *Toner v. Lederle Labs.*, 732 P.2d 297, 316 (Idaho 1987) (Bakes, J., concurring); *Hoffman v. E.W. Bliss Co.*, 448 N.E.2d 277, 281 (Ind. 1983); *Ulrich v. Kasco Abrasives Co.*, 532 S.W.2d 197, 200 (Ky. 1976); *Phipps v. General Motors Corp.*, 363 A.2d 955, 959 (Md. 1976); *Back v. Wickes Corp.*, 378 N.E.2d 964, 970 (Mass. 1978); *Prentis v. Yale Mfg. Co.*, 365 N.W.2d 176, 182 (Mich. 1984); *Bilotta v. Kelley Co.*, 346 N.W.2d 616, 621-22 (Minn. 1984); Miss. Code Ann. § 11-1-63 (1993) (establishing different liability tests for manufacturing, design, and failure to warn defects); *Nesselrode v. Executive Beechcraft, Inc.*, 707 S.W.2d 371, 375-77 (Mo. 1986); *Rix v. General Motors Corp.*, 723 P.2d 195, 200 (Mont. 1986); *Thibault v. Sears, Roebuck & Co.*, 395 A.2d 843, 846-47 (N.H. 1978); *O'Brien v. Muskin Corp.*, 463 A.2d 298, 304 (N.J. 1983); *see also* N.J. Stat. Ann. §§ 2A:58C-2, 3 (West 1987) (establishing different defenses based on whether product was defective in manufacture, design, or warning); *Denny v. Ford Motor Co.*, 662 N.E.2d 730, 735 n. 3 (N.Y. 1995); *State Farm Fire & Casualty Co. v. Chrysler Corp.*, 523 N.E.2d 489, 494 (Ohio 1988) (*see also* Ohio Rev. Code Ann. §§ 2307.74-76 (Anderson 1991) (establishing different liability tests for manufacturing defects, design defects, and failure to warn)); *Phillips v. Kimwood Mach. Co.*, 525 P.2d 1033, 1035-38 (Or. 1974) (*see also* Or. Rev. Stat. § 30.900 (1991)); *Turner v. General Motors Corp.*, 584 S.W.2d 844, 847-48 (Tex. 1979) (*see also* Tex. Civ. Prac. & Rem. Code Ann. § 82.005 (West 1993) (sets standards for proving a design defect which do not govern a manufacturing defect)); *Peterson v. Safway Steel Scaffolds Co.*, 400 N.W.2d 909, 912 (S.D. 1987); *Baughn v. Honda Motor Co., Ltd.*, 727 P.2d 655, 661 (Wash. 1986) (*see also* Wash. Rev. Code Ann. § 7.72.030 (West 1992) (establishing different standards for manufacturing, design, and failure to warn defects)); *Morningstar v. Black & Decker Mfg. Co.*, 253 S.E.2d 666, 682 (W. Va. 1979).

No. 17-30499

main categories of product defects is also well recognized by eminent law professors and treatise writers; indeed, it is so fundamental that most casebook authors and treatise writers organize their discussions concerning product defects around these categories. *See* Restatement (Third) of Torts: Products Liability § 1, cmt. a, note 1.[3] Legal scholarship and commentary also recognize this division as fundamental to the law of products liability. *Id.*[4]

---

[3] *See, e.g.*, Fischer and Powers, Products Liability: Cases and Materials Ch. 2C (1988); Franklin and Rabin, Tort Law and Alternatives 492-541 (6th ed. 1996); Henderson and Twerski, Products Liability: Problems and Process Parts I and II (3d ed. 1997); Madden, Products Liability: Chs. 8, 9, 10 (2d ed. 1988); Noel and Phillips, Products Liability: Cases and Materials Chs. 5-7 (1976); Owen, Montgomery and Keeton, Cases and Materials on Products Liability and Safety Ch. 7 (3d ed. 1996); Phillips, Terry, Maraist, McClellan, Tort Law: Cases, Materials, Problems 717-30 (1991); Keeton, Dobbs, Keeton and Owen, Prosser and Keeton, On the Law of Torts § 99 (5th ed. 1984 & Supp. 1988); Shapo, The Law of Products Liability Chs. 9, 19 (2d ed. 1990).

[4] *See, e.g.*, Sheila L. Birnbaum, *Unmasking the Test for Design Defect: from Negligence [to Warranty] to Strict Liability to Negligence*, 33 Vand. L. Rev. 593, 599-600 (1980); David K. DeWolf & Keller W. Allen, *Liability for Manufacturers in Washington: When Is Strict Liability Appropriate?*, 27 Gonz. L. Rev. 217, 235-39 (1991/1992); Dennis J. Dobbels, *Missouri Products Liability Law Revisited: A Look at Missouri Strict Products Liability Law Before and After the Tort Reform Act*, 53 Mo. L. Rev. 227 (1988); Raymond J. Kenney, *Products Liability in Massachusetts Enters the 1990's*, 75 Mass. L. Rev. 70 (1990); Keith Miller, *Design Defect Litigation in Iowa: The Myths of Strict Liability*, 40 Drake L. Rev. 465, 471 (1991); William Mowery, Comment, *Torts—A Survey of the Law of Strict Products Liability in New Mexico*, 11 N.M. L. Rev. 359, 383-87 (1981); Note, *Minnesota Replaces the Restatement Standard with a Negligence Standard*, 11 Wm. Mitchell L. Rev. 891, 892-96 (1985); David G. Owen, *The Moral Foundations of Product Liability Law: Toward First Principles*, 68 Notre Dame L. Rev. 427, 463-77 (1993); William Powers, *A Modest Proposal to Abandon Strict Products Liability*, 1991 U. Ill. L. Rev. 639 (1991); Sales, *Product Liability Law in Texas*, 23 Hous. L. Rev. 1, 15-97 (1986); Gary T. Schwartz, *Foreword: Understanding Products Liability*, 67 Cal. L. Rev. 435, 460-

No. 17-30499

Yet, contrary to this overwhelming weight of consistent authority, the unquestioning literal acceptance of §60(B) urged by Remington totally goes against the grain of Louisiana's well-balanced, comprehensive products liability system insofar as firearms are concerned, and, if given credence, would undermine the most basic principle of products liability: to hold manufacturers equally and fairly liable for damage caused by the marketing of unreasonably dangerous products. A literal application of §60(B) would render a gun manufacturer immune from liability when it sells a firearm that can, because of a defective trigger-firing-pin design, discharge autonomously (without a trigger pull), putting all in range at risk of severe injury or death. A literal application would insulate a gun manufacturer from liability even when the manufacturer has knowledge of the unreasonably dangerous design defect, yet does nothing to rectify it and chooses instead to continue to knowingly sell the unreasonably dangerous and defective firearm. This is an absurd result that conflicts with the basic principles of Louisiana and American products liability law, and it cannot be seen as anything other than a colossal and unwelcome aberration in the law otherwise designed to protect consumers and ordinary citizens.

As the district court correctly explained, pursuant to Louisiana Civil Code article 9, "[w]hen a law is clear and unambiguous *and its application does not lead to absurd consequences*, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature." La. Civ. Code art. 9 (emphasis added). However, "where a literal interpretation would produce absurd consequences, the letter must give way to the spirit of the law and the statute construed so as to produce a reasonable result." *Sultana Corp. v. Jewelers Mut. Ins. Co.*, 860 So. 2d 1112, 1116 (La.

---

81 (1979); John W. Wade, *On the Nature of Strict Tort Liability for Products*, 44 Miss. L.J. 825, 830-38 (1973).

2003) (citations removed); *see also* P. RAYMOND LAMONICA & JERRY G. JONES, 20 LOUISIANA CIVIL LAW TREATISE: LEGISLATIVE LAW AND PROCEDURE § 7.4 (2011 ed.) ("In situations where the *application* of statutory or constitutional text is judicially determined to create an 'absurd consequence,' the literal language of the law need not be followed."). In order for a court to find that a literal application results in absurd consequences, "there must be a determination by the court that the specific application at issue arising from the literal wording would, if judicially enforced, produce a factual result so inappropriate as to be deemed outside the 'purpose' of the law." *See, e.g.*, *McLane S., Inc. v. Bridges*, 84 So. 3d 479, 485 (La. 2012) (quoting LAMONICA & JONES, § 7.4).

The Louisiana Supreme Court has interpreted multiple statutes under this doctrine, holding that application of the literal wording of the statute would produce absurd results. *See Gulley v. Hope Youth Ranch*, 221 So. 3d 21, 27 (La. 2017) (holding that Office of Workers' Compensation's application of Medical Treatment Guidelines was invalid because it led to an absurd result that was medically unsound); *McLane S.*, 84 So. 3d at 485-86 (holding that excise tax applied to smokeless tobacco, even though the legislature failed to amend one portion of the Tobacco Tax Law, because holding to the contrary would cause "a result outside the purpose of the Tobacco Tax Law as a whole" and would be absurd); *Webb v. Par. Council of Par. of E. Baton Rouge*, 47 So. 2d 718, 720 (La. 1950) (construing the word 'election' in a statute to mean 'primary election' rather than 'general election' to avoid an absurd result); *Bradford v. Louisiana Pub. Serv. Comm'n*, 179 So. 442, 446 (La. 1938) (construing an 'or' in a statute as an 'and' to avoid an absurd result) (citing *Gremillion v. Louisiana Pub. Serv. Comm'n*, 172 So. 163 (La. 1937)).

In my view, the present case is another instance in which the Louisiana Supreme Court, in a case arising in its court system, would declare that the

application of the literal wording of a law would lead to absurd consequences. Applying §60(B) literally as a stand-alone law would lead to the absurd consequence that if a manufacturer designed a gun that could discharge autonomously without a trigger pull, no person injured because of that defect would be allowed to recover damages from the manufacturer. This is a legal consequence so inappropriate as to be outside the original LPLA, its design defect definition, *see* § 9:2800.56, its jurisprudential antecedents, *see Halphen*, 484 So. 2d 110, and United States products liability law in general, *see* Restatement (Third) of Torts: Products Liability § 1.

The LPLA provides that a manufacturer "shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity." La. R.S. 9:2800.54(A). It defines an unreasonably dangerous product, *inter alia*, as one "unreasonably dangerous in construction or composition," "unreasonably dangerous in design," or "unreasonably dangerous because of inadequate warning," as defined by §§ 9:2800.55, .56, and .57. *See* La. R.S. 9:2800.54(B). Under a literal application of §60(B), even where a firearm is "unreasonably dangerous in design" such that it discharges without a trigger pull, a manufacturer could not be held liable. This would contravene the purpose of the LPLA to provide an avenue for holding manufacturers responsible when a product leaves its control that is unreasonably dangerous because of a design or warning defect, as well as by reason of a manufacturing defect.

The absurdity of these consequences is also well-illustrated by the strength of Seguin's defective design claim that would be relegated anomalously to a frivolous manufacturing claim by §60(B). Seguin's expert, Charles W. Powell, would have testified, according to his Engineer's Report, that the model of firearm at issue, a Remington Model 710 bolt action rifle,

No. 17-30499

was defectively designed in that its construction allows foreign materials to build up unseen inside the fire control assembly (the "Walker trigger"), which can cause the weapon to fire without the user pulling the trigger. The Eighth Circuit, in a case in which Powell also gave expert testimony, found this alleged defect to be present in the fire control assembly of the Remington Model 700, which is the functional equivalent of the Model 710's fire control assembly. *See O'Neal v. Remington Arms Co.*, 817 F.3d 1055, 1057–58 (8th Cir. 2015). In *O'Neal*, the court explained that the "inherent design" of the Walker trigger assembly is such that, if its operative components are "misaligned by as little as 1/100th of an inch," the result can be "the weapon discharging without the trigger being pulled." *Id.* Because "[v]ery small pieces of dirt, manufacturing residue, corrosion deposits, lubricant deposits, firing deposits, and even condensation can get trapped between the connector and the trigger when the two parts separate" every time the rifle is fired, the risk of such misalignment is high. *Id.* at 1057. Further, the *O'Neal* court found evidence that Remington had been aware of the Walker trigger assembly's defective design for decades, yet did nothing to fix it. *Id.* at 1057–58 ("Remington knows the Walker trigger can cause Model 700 rifles to fire a round when the safety lever is released from the safe position to the fire position, without the trigger being pulled . . . Remington knew about this problem with the Walker trigger at least as early as 1979.").

For all of the foregoing reasons, I respectfully dissent from the majority's decision to certify a question to the Louisiana Supreme Court, rather than applying that court's already developed precedents dealing with statutes leading to absurd consequences and that clearly control in the present case and require that the district court's judgment be affirmed.



A True Copy
Certified Jan 06, 2022

*Tyle W. Cayce*

Clerk, U.S. Court of Appeals, Fifth Circuit